Next case is Worley v. Robinson and Mr. Morse. Good morning, Your Honors.  My name is Clint Morse. I'm here today with Mr. Jeffrey Olnick. We represent Appellant Jason Worley. Your Honors, this is a case of an appeal dealing with the denial of Mr. Worley's discharge. The denial is under Code Section 727A4A. Under that section, the Robinsons, the objecting creditor, had the burden of proving that Mr. Worley made a false statement under oath knowingly and fraudulently that was in interconnection with the case. The statute is construed in favor of Mr. Worley and strictly against the Robinsons. And the elements of the claim are that there was a false statement under oath, that it was knowingly and fraudulently, and it was material to the case. The first two elements deal with Mr. Worley's assessment, Mr. Worley's estimate of the value of Gemini LLC. I'm going to handle both of those issues. Mr. Olnick will deal with the materiality prong. Your Honors, this deals with the value of Gemini LLC, which Mr. Worley put on his bankruptcy schedules. He wrote down, I own a minority interest in Gemini LLC, and Gemini itself owns an interest in Pelham LLC, and Pelham owns 500 acres of real estate. And they put down as the valuation $2,500. He came up with that valuation based on his experience and training dealing with the capitalization rate method of valuation. Before we get into that, and I do want to hear you on that point, is the question of whether a false statement is knowingly made, is that not a finding of fact subject to clearly erroneous review? Your Honor, typically it is. But this case, there's a lot of— Then why is this different? Because, Your Honor, the question of whether he made a false statement turns on the valuation of Gemini LLC. The dispute here is about is this worth $2,500? Whether he knowingly did, wouldn't that be involving the bankruptcy court's assessment of his credibility as to whether it was just carelessly made or whether the false statement was knowingly made? Your Honor, the bankruptcy court and the district court both decided that Mr. Worley acted against his own knowledge because they decided that the valuation method he used was not the right one. The problem is— But, I mean, what I'm asking is in the—it's not a criminal matter, I realize, because the sanction is a denial of a discharge, but isn't the question of knowingly or the men's ray of a false statement, whether it was just careless or whether it was knowingly, isn't that a matter of credibility? Your Honor, it typically is. But the issue here, the way the court reached the determination that he wasn't credible is because they determined that his valuation method was not right. Now— Well, it was a little more than that. The court had to assume and could assume, I think, from the evidence that he picked a valuation method that had virtually no basis in order to somehow give the back of the hand to the value of the property. I mean, he put a distribution that got a, what, $483 distribution, and he multiplied by 5 and says that's the value. If you have that, then you have a million-dollar piece of real estate which is not income-producing, and he could put zero. Your Honor— And he deliberately put zero because he said, I used the income method, and the property is a piece of land which doesn't produce any income, but yet everybody agrees it's one of the most desirable pieces of land in town. It's a million-dollar piece of land, and he put zero on there. Well, and he himself put up $65,000 to fund his interest in Gemini, and that was never disclosed. So, I mean, it just—this—it seems to me that the district court— excuse me, the bankruptcy court could well have concluded he was hiding the ball. So, Your Honor, the issue here is the exact same issue that you guys are talking about is exactly what happened at the bankruptcy court, which is that they looked at the value of the property rather than going, what are his actual economic rights? Well, yeah, but when you look at the crops, their depositions, one of them testified that the buzzard value was, what, at least— or not at least, 20 to 30 percent of the fair market value, and if you reduce that, it comes out at, what, $13,000? So, that's a big difference between $13,000, even using his own partner's testimony as to the value. $13,000 versus $2,500 is pretty significant. And, Your Honor, I agree, as I put in the brief, that the value of Gemini's entire interest in Pelham is probably $13,000, even though the value of the property is—was— $26,000. Correct. The value—that's correct, Your Honor. The value of Gemini's entire interest in Pelham is probably $26,000. Right. But you don't— That's the paid-in value. I mean, there's some evidence that the land was sold at a much higher level at this point. We don't need to get into that. But what I do want to get back is your argument that seems to go something like this, that the capitalization method of cash flow is a legitimate method of evaluating property. He just selected that, happened to make an error in selecting the wrong one. And there are other methods that might have been more accurate. But there's real problems with that because if he did that deliberately to hide the ball and he really didn't have a basis for doing it, he had evidence all around him that indicates that it was worth more, including his own paid-in capital and then the sale, and he still insists on that. You know, this is equity. He's coming into the court to say, I'm making a fair and complete disclosure in exchange for discharge. Now, the provision does nothing more than carry out equity's unclean hands, that if somebody comes and misstates his position deliberately, he's not going to get the benefit of the chancellor's discharge. So, Your Honor, what the evidence actually is, what Mr. Worley testified to, is that he was not the managing member of Gemini. He had no control over Gemini. He had no ability to cause Gemini to sell it to him. Isn't that just a rationalization? That's what the court found, isn't it? It's true. But there was no evidence that these people didn't get along or that the 51% shareholder was trying to squeeze the 49% shareholder out of any distribution. I mean, these were two guys who went into business together, and at least so far as the record is concerned, the distributions were made such as they were, 51-49. I mean, I didn't see any evidence of acrimony that would render the minority shareholder's interest completely worthless. But the issue is, Your Honor, is that when, as Jason testified, which is the same as what's in the operating agreement, the original purpose was to invest in real estate. It was not to take then the distributions out, but was to reinvest and get money over time and additional capital over time. Why wouldn't the interest be the value of his interest in the real estate investment trust? Why wouldn't that be figured by sort of having the properties appraised and giving a small discount for illiquidity and then saying what's 49% of the appraised value of the property? Now, we don't know what's going to happen in the future, and we don't know what is going to happen five or ten years down the road to the properties. They may go way down. They may go way up. But, you know, we're trying to estimate it at the time of the petitions filed. And why not just appraise the real estate and say what's its appraised value? And then because it's not a liquid investment, I guess he's, you know, I'm willing to cut him some small discount because of the illiquidity of it. But then I would say, okay, what's 49% of what the appraised value is? Now, why not use that other than the fact it would result in a higher figure? Well, Your Honor, I will note something here. The Supreme Court in the TMT Ferry case was very clear that you've got to value an asset legally appropriately. And here we're talking about an interest in an LLC. An interest in an LLC is going to be based on what your actual economic rights are. Which was he had no right to a distribution for 43 years after the petition. But he didn't mention that until his reply brief in the district court. He was not relying on the operating agreement in the bankruptcy court, and he did not even mention it until well into the proceedings in the district court. So if that was so crucial to his case, I would think he would have brought it up sooner, wouldn't he? And that's all the more indicative of his fact of using a distribution that actually came out, a small $500, $480 distribution as the basis of evaluation. I mean, that is so misleading, and he knew it was misleading. Your Honor, I will note this is Joint Appendix page 111. The question, you testified that the goal of the investment in Gemini was to make money. Is that right? And the answer was it's a long-term investment. Over time buying real estate, hopefully selling real estate for a higher value, and then reinvesting it, not making distributions, reinvesting it, and just continuing that process. That's all the more the point. In other words, my hypothetical to you, what if the land produced nothing? It was, take a hypothetical. You have a million-dollar piece of property, one of the best sites in the city, overlooking the city. It can be developed into residential houses. Everybody agrees a million is a low price, and the man goes into bankruptcy and says, I have no distributions, therefore I declare zero, because I'm using the capitalization of cash flow. If your hypothetical debtor had the right to sell the property and get the value out? It doesn't matter. We're talking about the market value of the asset if they chose to sell it. So that's exactly, Your Honor, the market value of this asset is the market value of what Mr. Worley could get for his interest in Gemini LLC, which was an LLC. There may be one way of doing it. There are many ways, as you know. There's a market value. There's a stream of income value. There's asset value. I mean, there's all kinds of ways you can do it, but appraisers will take a piece of real estate and determine the appropriate value to be representational of what the property is worth. This man took one distribution of $483 and says, because I have a distribution, I can use the cash method, when he says distributions really are not the key to that property. The key to the property was selling it at a higher level than he paid for it. Your Honor, I will note one additional thing there. The key to the investment in Gemini LLC, we're talking about the key to the investment in Gemini LLC. That's what we're talking about the fair market value of. And the key to the investment in Gemini LLC was investing in real estate, accumulating capital over time. But that's derivative value. I mean, you can make that argument, as Judge Wilkinson said, you can give discounts because of those things. But the point is, the big point in this case, you're arguing the facts. But the big point in this case is whether this man showed bad faith in making a disclosure to the bankruptcy court, or did he misrepresent in a court of equity. And the court concluded, regardless of whether he thought or he says he thought that was a legitimate method, the facts don't support him. He didn't disclose his $65,000 investment for it, or his partner's $65,000. He put up $130,000. That's pretty serious money. Your Honor, I will note one thing, and then I'm going to turn it over to Mr. Olnick. I want to ask you just one question bluntly, which is, what was the appraised value of the properties held in this investment trust? Your Honor, there was no appraised value. And why is that? The bankruptcy code clearly does not require my client to get an appraisal. That standard would require every debtor who doesn't have money to come in and get an appraisal to fill out their bankruptcy form. That's not the standard. Well, but there can be some guesstimate, can't there? Absolutely. And the appraised value, if you didn't, so you don't get a formal appraisal, the appraised value is still above $2,500. Your Honor, the problem in this case is that no one looked at what his actual economic rights are. So, consequently, any evaluation method that the lower courts used cannot be legally appropriate because they were not actually looking at the asset at issue. Your view leads to the fact that a minority shareholder's interest in a trust is always worthless. That is pretty accurate, Your Honor. It may be accurate, but it's horrifying. And, Your Honor, if you have a minority interest in a trust, then the question is what is somebody going to buy that interest for? That's the fair market value. That's the test in an arm's length transaction. I'm not going to pay a whole lot for something that I'm not going to get anything from for 49 years. Okay. Thank you, Your Honor. What you're asking is that this man put $65,000 down for nothing, which is, you know, that's kind of hard to take. Your Honor, I will— Let your partner answer that, okay? Because this is a question we have. Why would you pay $65,000 for nothing? Come on up and answer that question. Yes, sir. Your Honor, may it please the Court, Jeff Olenek, as Mr. Moore said, I'm going to address the third issue, which is the materiality. Actually, the way you framed it is did— Could you answer my question as to why, you know, he made a capital contribution to get the interest of $65,000, and now he represents it's worth no more than $2,500. Now, you know, this guy's a—what is he? He's got an advanced business degree? I mean, is that what they teach you in business school? Your Honor, I went to UVA Law School, not to the—across to the Darden School, so I don't know what they taught across the hallway. But they—MBA school, I assume they teach valuation methods. I would assume that to answer the question. But in terms of the appraisal, here's the answer to your question, I think. Judge Niemeyer's question is why wasn't there appraisal because it's not required in the Bankruptcy Code. There wasn't one. When is the appraisal usually done? It's done in connection with a hearing where you contest value, where there's contesting the— Except, see, the whole argument, it troubles me that we're not confronting the whole argument, which is, is he candidly making a fair disclosure to the court of his assets in a court of equity in exchange for the discharge? That's what the whole bankruptcy is. He has to come. And when somebody hides assets, lies, treats equity with unclean hands, equity will not discharge and give a discharge. And the whole point here isn't whether he's right or wrong. The question is whether he was trying to hide the ball. And the court found he was. Your Honor, I'd slightly disagree with that. I think what the court found was his valuation method, I think she used the terms, was incredible. She didn't find that he was trying to hide the ball. In fact, the— And a fraudulent deliberate. That's the requirement of that section. That section also has, Your Honor, a—well, not the section, but as that section has been interpreted, primarily the Olson decision out of the Tenth Circuit, one of the elements is materiality. This court— Now, let me ask you about the fraudulent. Did the court find that his statement was fraudulent? She did. Okay, that's deliberately false. In other words, he knew it was false and he made it—that's the finding. Based on all the evidence. Now, I guess you want to go on to the other point. My point at that point is what is he doing in equity if he's fraudulently made a statement to the court on which he expected the court to rely? But you can address materiality if you wish. Well, Your Honor, I'll address the first point. You've seen the briefs below and here that we argue it was in—she disagreed. Judge, the Bank Street Court judge disagreed with the valuation method. Let's accept it as a fraudulent statement. It's still— What do you mean let's accept it? There had to be a finding. Right. So, I mean, I'm just saying— Well, let's not belittle that. That's a— Not belittle. Okay. So I'm going to go to materiality. In materiality, this Court has addressed twice, in the Williamson decision and then in the Faruqi decision. In those decisions, it in turn relies on the Shalek decision from the Eleventh Circuit. And the Code does not say materiality. That has sort of been imposed on the Code. This Court has accepted it. That's the Olson decision out of the Tenth Circuit. So one of the elements is it's material. And the way, if you take Shalek, Williamson, Faruqi, if you take the decision cited by Shalek— and this is the line of decisions including this Court twice— that you come down and the way it's described when Moore's—I mean Collier's on bankruptcy puts it all together, they ask whether the amount disclosed, what was disclosed, what was said on the financial statement, did it allow the trustee the ability to discover assets, or did it interfere with the ability for the trustee or creditor to discover assets or transactions? What's our definition in our court of materiality? I'll give it to Your Honor. It's relevance. Right. It is—and what this Court did was it quoted Shalek. And so— It's our law. Right, right. Okay. I'm just—but it's a quote of a quote. But the subject of a false oath is material and thus sufficient to bar discharge if it bears a relationship to the bankrupt business transactions concerned with the discovery of assets, business dealings, or existence and disposition of his property or it could be her property. Right. So it's material if it's related to the existence of property. Right. And here, Your Honor, that's the point of materiality. And let me point out— But isn't that indisputable? This was a piece of property. This wasn't something irrelevant. This is a false statement with respect to an asset being disclosed as a condition of getting discharged. Your Honor, Williamson case dealt with failure to disclose two bank accounts and money that went out of the bank account to— Doesn't this have a direct bearing on—you know, the assets of an estate has a direct bearing on what distributions are going to be made to creditors? Your Honor, what the court—the Williamson case, Faruqi case, Shallot case, the two cited by Shallot, all the cases cited on 53 and 56 of the appellant's brief, when you get to this issue, all those cases are omissions. They're omissions. They deal with somebody not telling the trustee that they have an asset. But there's nothing in the statute that somehow says it doesn't apply to under-evaluations. It just—it doesn't say for knowingly making—for knowingly failing to disclose an asset. It could have been written that way. The statute could have been written in saying for knowingly failing to disclose an asset. But it wasn't written that way. It was written more broadly to cover false statements. And the question I have is, shouldn't the statute apply to under-evaluations rather than omissions as well as omissions and failures to disclose? Why? Because when you undervalue assets such as, you know, in this case, real property, don't you simply diminish what can be the subject of a distribution to the estate's creditors? Your Honor, what the standard has evolved to, and I've read what the standard is in the Fourth Circuit, is does it impede or interfere with the trustee or creditor's ability to discover the assets and fully investigate their values? So that's why all the cases— Of course it has to impede it. I think we say if it's relevant to it. And the statute says in connection with the case, in or in connection with the case. That's all it says. The statute says debtor knowingly and fraudulently in or in connection with the case made a false account. That's the standard. And now we basically have said makes it relevant to the case. That's not far off from that. But now to put on notions of prejudice and impeding and all that, that isn't what equity is about. We're in a court of equity. This is not a criminal case. This is a case where he comes hat in hand and says give me a discharge in exchange for my good faith disclosure. And he did not make a good faith disclosure as found by the district court. And the question—you can argue that the court didn't have the evidence to make the finding, but I don't think you can argue that it wasn't material. Your Honor, I see that my time is up. Yeah, respond to that. Sure. Respond to that. The evidence in the record, Your Honor, this trustee in this case, and this is where most of the cases dealing with omission versus undervaluation come out. The trustee in this case said, one, I view schedules as a starting point. Two, I had enough here that I knew what to look into. He said from here I could take it on my own. This was just a starting point. So what does that do? A guy comes in and deliberately lies, fraudulently lies, as he's found, and we say, okay, we're going to give him a discharge because the trustee was able to work around it. That's the argument you're making. Your Honor, I'll continue to answer your questions as long as you want me to, but I see the red light is on. No, Your Honor, it's a question of materiality, and there are some courts that said even if somebody came in and fraudulently said something, if the trustee had enough information, like Town of Scalatineo Natales, there is some. But I'm not suggesting that omission is the only standard. There is undervaluation. The only case that district court could find was the cost case, and I think what's instructive in the cost case was one where he had scheduled the property at $400,000 on his insurance. House burned down. He got the check. He enlisted under the exemption level with regard to that. And one final statement from that decision, and then I'll sit unless the Court has questions. What that court in cost says, we've got to be careful here because a bankruptcy petition would be little aid to debtors in need of fresh start if creditors could easily attack the granting of a discharge. And if debtors are required to get appraisals of everything in their house, all their limited partnership, illiquid entities, that's where we'll be instead of having valuation hearings. I understand the point, and I want to ask opposing counsel about it. Let's hear from them, okay? Yes, sir. All right. Thank you. Thank you. Mr. Adams, I want to ask you about a question that both Mr. Morse and Mr. Allinique have raised with us, and that is if you don't like the capitalization method, what should this debtor have done? One suggestion has been made that we should appraise the value or look to the appraised value. Oftentimes an appraisal has been done. Look to the appraised value of the properties in the investment trust. And so when Mr. Morse was asked about that, he said, well, you can't ask impecunious debtors to come in and pay for all of these appraisals. Well, that, you know, I'd like to hear you respond to that and just answer the question of how you think the value of this should be calculated. Were there prior appraisals? Very often there are appraisals in the course of assessing a property tax. As a matter of fact, I have a chance to appeal my appraisal every year. It increases, which it regularly does. And so maybe one answer to this is that we could take the city government's appraisals, which are always, they say, on the low side, but, you know, that's another issue. How should his interest in the trust have been evaluated? Well, Your Honor, let's start with the original situation here. Jason Worley's good buddy, Josh Kraps, childhood friend, has a father, Daniel, who's in the real estate business and does deals like this. He what? Does deals like the one that Pelham had. He puts together real estate deals. So he puts together a real estate deal in south Georgia. He wants to cut his son and Mr. Worley into the deal. Okay, but you're backing up on my question. Okay. You know, that's a lot of times litigants do that. They just back way up on the question. I want to know. Let me go forward. All right, but I want to know how you think he should have valued his interest in the trust. He should have come into Phil Bolton's office on day one asking to get into a court of equity and saying, what do I do? Here's this asset that I have, this minority interest. He should have called his buddy, Josh Kraps, and he should have called Daniel Kraps and said, gosh, tell me what you think this is worth today. That would have cost him nothing. There would have been no appraisal expenses. He could have perhaps looked at the tax value and the records in south Georgia. But the bottom line is, in this particular case, he could have easily assessed what the people who knew the most about the real estate thought the actual value of it was. And he would have gotten back. So is Mr. Kraps' estimation of the value of the interest going to be more reliable than Mr. Worley because Mr. Kraps is the managing partner and the hands-on partner, and Mr. Worley is just sort of a limited partner who's in it for the investment return? Mr. Worley knew that was the case and testified that both Joshua Kraps and Daniel Kraps would be in a better position than he would be to assess the value of this property, and he didn't do that. Mr. Kraps said that the Gemini's interest in the Pellon land group was $26,000, so you have at least another reference point for that. So your response to them is, no, you don't need to go to the full expense. There wasn't any need to go to the full expense of appraisals. You could have asked Mr. Kraps. Now, what basis would Mr. Kraps have had for giving a solid figure on the valuation of Mr. Worley's interest? Presumably he knew something about the real estate market in that area. He knew what had been paid for that property originally. He perhaps could assess whether it was one property. This was one deal. I thought there was testimony that property in that area generally runs for about $2,000 to $2,500 an acre. I think there was testimony to that effect. And that is a generalized notion that everybody accepted. I mean, I know that farmland out in Maryland, central Maryland, is in that range at $2,000 to $2,500 an acre, and that was well known by everybody talking about it there. But the danger about saying whether he picked the right or the wrong one doesn't lead to the right answer. The question is, did he pick one that he knew was wrong in order to understate it? He rationalized a method. He used a cash flow, a multiple, capitalization of cash flow, which he knew was not the nature of that property. That's correct. And that was the problem. If he had made a good faith effort to find out, even from himself, what's it really worth, he would have called craps at least and said what's it worth, or his father, or he could have gone around further just knowing the market if he didn't know the market. But if he did not know the market and he claims total ignorance about it, then it's even worse because now he's putting a value on it just to get himself off the hook with respect to fair disclosure of the values. Of course. And that's what Judge Aaron found as a finding of fact, subject to the clear error review standard here. At the very least, Worley knew what he had paid for it. He knew he had $65,000 in his interest. And he would have to have some explanation in his own mind as to why it went from $65,000 to $2,500. Correct. There's no evidence anywhere that some catastrophic event had happened that would cause timberland to plummet in value by 90-something percent. That's the oddest thing about it is you've got this $65,000 capital contribution for an interest that you now claim is worth $2,000. A debtor ready to go into a court of equity is going to say to his lawyer, well, look, I'm not sure what this is worth because I've got this minority interest in a minority interest, but I do know that I put $65,000 in it X years ago. Let me call Daniel Kraps or Josh Kraps and see if they think the value of the $65,000 was never disclosed to the bankruptcy. That's correct. That was a testament. That's what's troublesome about it because the $65,000 would have had some bearing and it would have made the $2,500 figure look very suspicious. And that was not disclosed. That's correct. And that's the problem. That's one of the big problems that Judge Arendt found in this case when she heard all of the evidence was that there was not the full disclosure of what the debtor actually knew at the time was a value that he had put into this. It's just patently ridiculous to have used the method that he asserted that he had used on property like this. If I could speak to the materiality issue for a moment. The statute defines the materiality, and however close we get to it, it's better to start with the statute. I think our cases are faithful to it, but the statute says in or in connection with. It's a very broad standard. It's like all things in bankruptcy. The bankruptcy estate is broad, and the concept of being connected to or material to a case, to a particular case, is very broad. But we don't, in this case, we don't even have to, you know, parse small issues here because this is a situation where a bankruptcy judge could have seen that what could have happened, and perhaps what Worley's goal was, was to put on his schedules a value so small that a trustee, seeing a minority interest in property that was two states away, would say, well, I'm not going to go to any trouble to try to bring $2,500 into this estate by somehow liquidating this interest that he has, and might have abandoned the asset back to Worley, who then would have gotten $49,000. So he was hoping that creditors would just lose interest and the trustee wouldn't bother? That's right. The trustees in no-asset cases don't get paid unless there are assets that materialize and turn into cash. So they often make this value judgment, well, how much work and cost and whatever am I going to do in order to try to bring $2,500 into the estate? There's something of a thin line to be walked here because, you know, you don't want to discourage people from, I mean, you don't want to undercut the essential value of bankruptcy by denying debtors a fresh start, but at the same time, you don't want to encourage fraud upon the court and upon the bankruptcy process. And I think you make the valid point that the process relies to a considerable extent on self-reporting, and if the reporting isn't honest, creditors or the trustee or the court are going to have to spend all kinds of time trying to go beyond the debtor's valuation in a property like this and discovering if they care to what its real worth is, and that bogs the process down considerably. And then you put on top of that this argument that because the trustee figured out that there was something more here than a $2,500 asset, he went and did the work. He ended up bringing money in. He brought over $40,000 into the estate based upon the sale that had occurred right before the trial happened. Well, the argument seems to be that, well, if the trustee figures my ruse out and the case gets resolved as if I had made full disclosure, no harm, no foul, it's basically an argument that the debtor gets one free perjury in a bankruptcy case. And from back to Judge Niemeyer's point earlier, this is a court of equity, and debtors have to come in with clean hands and full disclosure based on their best information. Debtors don't have to be perfect. You've seen all the cases that talk about that. That's the danger of getting too much into an argument about what is the appropriate evaluation and how does a person go about evaluating this property. That's not the fact here. The fact here is he clearly avoided trying to seek the appropriate valuation. That's correct. That's what the evidence was found, I mean, whether there's evidence to support it. And the main evidence is that he paid $65,000 for his share, which would be the obvious beginning point, and then without explanation reduced that to $2,500. That's correct. Unless the Court has other questions. Thank you. Thank you, Your Honor. All right, I don't see any further time requested, so we'll come down and greet counsel and then move into our final case.
judges: J. Harvie Wilkinson III, Paul V. Niemeyer, Barbara Milano Keenan